

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

**ENTERED**
**10/19/2012**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 11-35901** |
| JOON H. RHEE | § | **CHAPTER 7** |
| | § | |
| Debtor(s). | § | **JUDGE ISGUR** |
| | § | |
| | § | |
| SHYH-KUEN ROGER WU, *et al* | § | |
| | § | |
| Plaintiff(s), | § | |
| | § | |
| vs. | § | **ADVERSARY NO. 11-3491** |
| | § | |
| JOON H. RHEE | § | |
| | § | |
| Defendant(s). | § | |

## MEMORANDUM OPINION

Joon Rhee's actions constitute: (i) fraud in a real estate transaction in violation of § 27.01 of the Texas Business and Commerce Code; (ii) fraudulent inducement; (iii) false, misleading, and deceptive trade acts in violation of § 17.46 of the Texas Deceptive Trade Practices Act; (iv) breach of contract; (v) conversion; and, (vi) common law fraud.

As a result of Rhee's actions, the Wus sustained actual damages in the amount of $20,000.00. The Court awards the Wus $5,000.00 in exemplary damages. The Wus are entitled to receive their attorneys' fees and court costs as prevailing plaintiffs under the relevant state statutes.

The Wu's claim against Rhee is excepted from discharge under § 523(a)(2)(A).

## Background

The parties agree upon most relevant facts.

When Shyh-Kuen Roger Wu and Yeh-Peng Esther Wu decided to purchase a new home, they retained Joon Rhee, a family friend and real estate salesperson. Rhee was not a licensed broker and therefore needed a licensed sponsoring broker. Jaclyn Nall acted as the sponsoring broker.

At the time Rhee was initially retained, the Wus had already identified a property and negotiated a price. If the Wus had consummated the purchase of that property, Rhee's broker duties would have been limited. The initial commission agreement reflected this fact. Under that initial agreement, Rhee was to keep only $10,000.00 of the commission and rebate the rest to the Wus. (ECF No. 10 at 3).[1]

The Wus did not purchase that first property. Rhee continued to perform work for the Wus in their search for a new home. Rhee assumed typical broker duties on the subsequent properties. The parties did not revisit the commission issue until this dispute arose.

In the summer of 2010, Rhee negotiated a $2,000,000.00 purchase price on behalf of the Wus for a home located at 1305 South Boulevard in Houston, Texas. A dispute arose over the commission arrangement while the deal was in the process of being finalized. The Wus and Rhee disagreed as to how the real estate commission of $60,000.00 would be split. (ECF No. 17-3; ECF No. 17-4).

Rhee maintained that the initial agreement (Rhee would receive $10,000.00 and rebate the balance of the real estate commission to the Wus) was only valid as to the initial property. (ECF No. 17-4 at 3). Rhee stated that he agreed to rebate a portion of his commission because the Wus had essentially acted as their own broker as to the initial property. Rhee argued that the

---

[1] The total commission on the first property is unknown. If it had been calculated at the same rate as the 1305 South Boulevard deal, it would be 3% of the purchase price.

initial arrangement was not valid on any later deal after he assumed all typical broker duties.[2] The Wus disagreed and attempted to hold Rhee to the initial commission arrangement.  (ECF No. 17-4 at 1).

In an attempt to settle the dispute, Rhee offered to divide the $60,000.00 commission evenly amongst himself, his fledgling company (Jackie Nall & Associates), and the Wus.  (ECF No. 17-3 at 1).  Rhee made the offer during a phone call with Esther Wu and also via email to Roger Wu.  (Pl. Ex. 1 at 1).

The offer had one catch.  Rhee wanted his company to be credited with the sale, listed as the selling company, and noted as receiving the entire broker's commission.[3]  Rhee represented that the deal would work as follows:  Rhee's company would receive the $60,000.00 brokerage commission at closing and Rhee would then issue a check to the Wus (and presumably a separate check to himself) for $20,000.00.  (ECF No. 17 at 5).

The stories diverge at this point.  The Wus allege that Esther Wu accepted Rhee's offer over the phone.  Rhee alleges that the Wus refused his offer but nevertheless decided to go forward with the purchase without resolving the commission issue in advance.

The Wus did purchase the home at 1305 South Boulevard.  In connection with the purchase, the Wus signed paperwork indicating that they were not to receive any commission.[4] As Rhee's settlement offer included the condition that his company (Jackie Nall & Associates)

---

[2] "The deal we had originally agreed upon was made 2.5 years ago and has no relevance [sic] to this deal.  It was 10k to call a guy about a property, submit an offer, and if it worked out, I handle [sic] paperwork and everything else that goes with it, and I keep 10k."  (ECF No. 17-4 at 3).

[3] "And, our company must get credit for the sale.  As we are a fairly new company, the commission must be standard and we must collect from seller and be listed as the selling company.  We're building our sales numbers. At closing, we will cut you the check for $20, I mean $20,000 dollars."  (ECF No. 17-3 at 1).

[4] The accompanying Settlement Agreement stated that the $60,000.00 commission went solely to Jackie Nall & Associates.  (ECF No. 16-3 at 3).  The Commission Disclosure Attachment listed both Joon Rhee and Jackie Nall & Associates as commission recipients, but not the Wus.  (ECF No. 16-4 at 1).

be listed as receiving the full commission, these documents are consistent with both Rhee's and the Wus' version of events.

The Wus never received any money.  The Wus attempted to contact Rhee via phone and email on numerous occasions after closing.  Rhee admitted that he intentionally did not respond in order to avoid a discussion about the commission.

The Wus eventually sued Rhee, Jaclyn Nall (the sponsoring broker), and Jackie Nall & Associates (the fledgling company) in state court.  Rhee filed for bankruptcy protection while the state court case was pending.  Rhee thereafter removed the state court case.  Rhee is the sole remaining defendant.

After removal, the Wus filed this adversary proceeding to liquidate the debt owed by Rhee and to except the debt from discharge under § 523(a)(2)(A) and/or § 523(a)(4).   The Wus allege the following causes of action: (i) breach of contract[5]; (ii) embezzlement, (ECF No. 10 at 9); (iii) failure to properly account for funds in a constructive trust, (ECF No. 10 at 10); (iv) false, misleading, and deceptive trade acts in violation of § 17.46 of the Texas Deceptive Trade Practices Act, (ECF No. 10 at 11); (v) common law fraud, (ECF No. 10 at 11); (vi) fraudulent inducement, (ECF No. 10); and (vii) fraud in a real estate transaction in violation of § 27.01 of the Texas Business and Commerce Code.

Rhee moved for summary judgment on April 2, 2012.  (ECF No. 16).  Rhee argued that all of the Wus' underlying causes of action require an enforceable contract (and thus a signed

---

[5] The Wus frequently reference the broken agreement in their complaint.  It is the substance of the relief sought, and the allegations pled, that courts must focus upon—not the particular label used.  *See Armstrong v. Capshaw, Goss & Bowers,* 404 F.3d 933 (5th Cir. 2005) (noting district courts must determine the true nature of a pleading by its substance, rather than its labels) (citing *Edwards v. City of Houston,* 78 F.3d 983, 995 (5th Cir. 1996) (*en banc*) ("[W]e have oft stated that 'the relief sought, that to be granted, or within the power of the Court to grant, should be determined by substance, not a label'") (quoting *Bros. Inc. v. W.E. Grace Mfg. Co.*, 320 F.2d 594, 606 (5th Cir. 1963)).  Additionally, Rhee's Motion for Summary Judgment lists breach of contract amongst the Wus' causes of action.  (ECF No. 16 at 3).

writing).[6]   Rhee argued that his email to Roger Wu did not constitute a signed written contract (or a signed memorandum).  (ECF No. 16). Rhee therefore concluded that the Wus had no valid causes of action, as the alleged commission agreement would be an unenforceable oral contract.

If the Wus have no viable causes of action, Rhee owes no debt.  If no debt is owed, there is nothing to except from discharge under § 523(a)(2)(A) or § 523(a)(4).  Therefore, Rhee argued that even under the Wus' version of the facts he was entitled to summary judgment.

Rhee's Motion for Summary Judgment, (ECF No. 16), was denied on May 17, 2012. (ECF No. 19).  In the accompanying Memorandum Opinion, the Court did not reach the issue of whether the email constituted a signed writing.  (ECF No. 20 at 6).  Rhee's Motion for Summary Judgment rested on a faulty premise.  Several of the Wus' underlying causes of action are viable regardless of whether the email constitutes a signed writing (and thus, regardless of whether the commission agreement is an enforceable contract).  (ECF No. 20 at 6).  Therefore, even if his argument regarding the email is correct, Rhee was not entitled to summary judgment.

After denial of Rhee's motion, a trial was held on August 22, 2012.

### Findings of Fact

The key factual dispute is whether the Wus accepted Rhee's settlement offer.  Dispositive nontestimonial evidence on this issue does not exist.  Rhee's testimony is completely incompatible with the Wus' testimony on this issue.  The Court must decide which version of events to believe.

The Court accepts the Wus' version of events.  The Court finds that the Wus accepted Rhee's offer to split the commission equally three ways.  This conclusion was reached primarily from listening to and analyzing the witnesses' trial testimony.

---

[6] As will be discussed in detail below, under Texas law a commission agreement related to the sale of real estate is within the Statute of Frauds.

Every aspect of Roger Wu's and Esther Wu's testimony was credible.  Their version of events was consistent, and they answered questions directly and without hesitation.  The Wus' version of events is much more plausible than Rhee's.

Although credible at other times, Rhee's testimony was not credible on the issue of the settlement offer and the surrounding events.  If Rhee's testimony is true, the Wus' actions make little sense.  In contrast, the Wus' actions are completely understandable under their version of events.

The Wus purchased the home even after the commission dispute arose.  In connection with this purchase, the Wus signed documents indicating that they were not to receive any portion of the commission rebate.  Based on the two competing versions of events, the Wus signed these documents after either: (i) reaching a private settlement agreement with Rhee where the Wus would receive $20,000.00 separately after closing; or, (ii) not reaching an agreement with Rhee and leaving the commission issue to be worked out after closing.[7]

The Wus are intelligent and capable individuals.   Roger Wu is a knowledgeable businessman.  For Rhee's version of events to be true, the Wus must have been willing (while the commission dispute remained ongoing) to sign documents indicating their agreement to have Rhee and Rhee's company retain the entire commission.  This was clearly not the Wus' position.  Based on the testimony, it is inconceivable that the Wus signed the documents without first

---

[7] Rhee never claimed that the Wus acquiesced and agreed to let Rhee keep the full $60,000.00:

> **Court**:  So, you thought when the contract was signed, that y'all had not yet worked out what to do about the $60,000.00?"
> **Rhee:**  In my mind, I felt like there was no agreement for me to give any of my commission to anybody . . . So . . .
> **Court**: But you thought you did not have an agreement with them one way or the other. They hadn't agreed to pay it and you hadn't agreed to rebate it.
> **Rhee:**  Well but the commission comes from the seller . . .  But yeah, yes sir. Yes.

(Trial Testimony 11:35:57 am –11:36:28 am).

resolving the commission issue with Rhee privately (with the belief that this separate agreement was valid and enforceable).

The Wus' version of events does raise the question of why the Wus would ever agree to sign documents purporting to show a different commission split than they had privately arranged with Rhee.  Viewed in context, the decision makes sense.  First, it was a condition to Rhee's settlement offer that Rhee's new company officially be credited with the entire commission. Second, it is clear from the trial testimony that the Wus believed their private agreement was valid and enforceable despite the language included in the documents. Third, and most importantly, the Wus reasonably believed that Rhee, an individual with whom they had a long relationship, would not commit outright fraud.

Rhee and Roger Wu enjoyed a good working relationship for a long period of time. (Trial Recording 11:20:02 am – 11:20:49).  It is true that the commission dispute and resulting lawsuit ruined this relationship. However, at the time the Wus accepted Rhee's settlement offer, the relationship was strained but not ruined.

After the dispute arose, the Wus and Rhee exchanged amicable emails in an attempt to negotiate a settlement.   (Pl. Ex. 1,2). Each email outlines their relative position while acknowledging the validity of the other's.  (Pl. Ex. 1,2).[8]  Roger Wu's email is conciliatory and inquires of Rhee whether the parties can compromise.  (Pl. Ex. 2) ("Is there any way we can meet somewhere so both of us can be happy? I truly hope we are able to close this deal.  Please advise.").  In response, Rhee sent the email with the proposal to split the commission equally

---

[8] Roger Wu began his email to Wu as follows: "Joon, I totally understand your points but on the other hand I hope you can see where I am coming from as well."  (Pl. Exh. 2 at 1).  This was in response to Rhee's email, which began:  "Roger, First, thank you for working with me on this deal.  I appreciate your business.  After thought and speaking to my advisers, here are my points."  (Pl. Exh. 2 at 1).

three ways.  (Pl. Ex. 1).   Instead of being filled with invective and thinly-veiled (or overt) threats, these emails indicate both sides sought a mutually beneficial and amicable settlement.

This email exchange occurred on the evening of June 15, 2010 and in the early morning hours of June 16, 2010.  (Pl. Ex. 1, 2).  Later in the day on June 16, 2010, Rhee spoke on the phone with Esther Wu.

The substance of the telephone conversation is disputed.   Rhee testified that the conversation again consisted of both sides outlining their relative positions and that no final determination was made.[9]   Esther Wu testified that she accepted Rhee's offer and told him to move forward with finalizing the purchase of the home.[10]  Either way, there is nothing to indicate that this telephone call changed the assumption under which the parties were operating.

In short, the Wus had no indication that Rhee was willing to commit outright fraud.  The Wus were certainly angry and frustrated that Rhee refused to go along with the original $50,000/$10,000 commission split (which the Wus believed was still valid).  At the same time, at least in the emails to Rhee, Roger Wu acknowledged that Rhee had a fair point:  Rhee had done more work on these later properties and perhaps was entitled to a larger commission.  Although the Wus disagreed with Rhee's position and surely felt entitled to the original commission split, nothing about the situation at that point indicated that Rhee was willing to defraud the Wus after a settlement was reached.  Given this context, it is understandable that the Wus would agree to sign documents purporting to show a different commission split than they had privately arranged with Rhee.

---

[9] Rhee testified: "That day she called me . . . we were talking about, she was talking about her points why she felt they should get the commission, I gave my points of why I felt that I should keep and [had] earned my commission . . ." (Trial Testimony 11:34:20 am –11:36:28 am).

[10] Esther Wu stated: "Basically, I cannot remember the exact wording, but basically I was telling him that we got the email, and we'll accept it, and let's move forward."  (Trial Testimony 10:31:24—10:31:39).

The Court finds that the Wus accepted Rhee's settlement offer.

**<u>Analysis</u>**

As stated above and in the Memorandum Opinion accompanying the Order denying Rhee's Motion for Summary Judgment, the Wus have certain viable causes of action regardless of whether Rhee's email constitutes a signed writing.

Nevertheless, the issue of a signed writing must be addressed.[11] Some of the Wus' causes of action depend on whether the email constitutes a signed writing or whether there is an applicable exception to the Statute of Frauds.

## I.  Causes of Action that do not Require a Signed Writing

### A.  Fraud in a Real Estate Transaction

#### i.  Elements

A signed writing is not required for a successful cause of action for fraud in a real estate transaction.  "Fraud in a transaction involving real estate . . . consists of a . . . false promise to do an act, when the false promise is: (i) material; (ii) made with the intention of not fulfilling it; (iii) made to a person for the purpose of inducing that person to enter into a contract; and, (iv) relied on by that person in entering into that contract."  TEX. BUS. & COMMERCE CODE § 27.01(a).

Rhee promised that he would rebate $20,000.00 of his commission if the Wus purchased the home.  The Court finds that the Wus accepted the offer.  The promise was false when made.  Rhee did not rebate $20,000.00 of his commission to the Wus, and never intended to do so.

---

[11] The reason a signed writing is required is that section 1101.86 of the Texas Occupations Code prevents a suit to recover a commission for the sale or purchase of real estate unless the agreement is in writing and signed by the person who is to be sued.   As will be discussed later, it is not clear whether this provision applies to brokers only, or to any person who claims an interest in such a commission.  *See Am. Garment Prop. v. CB Richard Ellis*, 155 S.W.3d 431, 436 (Tex. App.—El Paso 2004) (applying § 1101.86 to all persons).

A promise to pay $20,000.00 qualifies as "material" under any reasonable definition.

There is only one reasonable conclusion on the issue of intent given the facts of the case. Again, the Court finds that the Wus accepted Rhee's offer.  The Wus received no money.  Rhee refused to respond to the Wus' subsequent phone calls and emails.   The only reasonable conclusion is that Rhee made the promise without the intention of fulfilling it.[12]

Rhee made the promise for the purpose of inducing the Wus to enter into the contract to purchase the home.  After the dispute arose, it was unclear for a period of time whether the Wus were willing to move forward with the purchase of the home absent the rebate.[13]  Rhee extended the settlement offer to induce the Wus to go through with the purchase.

The Wus relied upon this promise in entering into the contract to go forward with the purchase of the home.

Rhee committed fraud in a real estate transaction.

### ii.  Actual Damages

 "A person who makes a false representation or false promise commits the fraud described [above] and is liable to the person defrauded for actual damages."  TEX. BUS. & COMMERCE CODE § 27.01(b).

---

[12] Rhee could have testified that while he made the promise with the intent to keep it, he later decided otherwise. Rhee's testimony was clear on this point, however.  Rhee testified that he made the promise and intended to keep it but that the Wus did not accept his offer. As the Court finds that the Wus did accept the offer, this necessarily calls into question Rhee's intent and undermines Rhee's testimony.  Moreover, Rhee's trial testimony conflicted with a prior sworn affidavit.  (ECF No. 17-5 at 2) ("[T]here was no intent on my part to execute or adopt any demand or proposal of Roger Wu or any proposal I made in response to such demand as any agreement between us.").  Rhee testified at trial that the affidavit had been prepared by his prior counsel and that he did not review it as closely as he should have before signing it.

[13] In an email to Rhee, Roger Wu stated:  "Believe it or not $2 M is my upper offer with our original fee agreement factored in.  Esther and I were ready to walk away from the deal if it goes over $2M.  The truth is it would be nice to have the property but it is quite OK to give it up if it goes over $2M."  (Pl. Ex. 2).

The amount of actual damages is $20,000.00.  This is the sum Rhee promised to rebate to the Wus.

### iii.  Exemplary Damages

"A person who makes a false representation or false promise with actual awareness of the falsity thereof . . . is liable to the person defrauded for exemplary damages.  Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness."  TEX. BUS. & COMMERCE CODE § 27.01(c).

Rhee was actually aware of the falsity of the promise he made to the Wus.  Rhee is therefore liable for exemplary damages.

The Wus are also entitled to exemplary damages because they have shown by clear and convincing evidence that the harm inflicted upon them resulted from Rhee's fraud.  TEX. CIV. PRACTICE & REMEDIES CODE § 41.003(a)(1).

"In determining the amount of exemplary damages, the trier of fact shall consider the evidence, if any, relating to: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; (5) the extent to which such conduct offends a public sense of justice and propriety; and (6) the net worth of the defendant."  TEX. CIV. PRACTICE & REMEDIES CODE § 41.011(a).

The first five factors weigh in favor of a significant exemplary damages award.  Rhee's conduct and the wrong he committed are of a serious nature.  The situation is made worse by the

fact that Rhee acted intentionally and that he committed the fraud while owing the Wus a fiduciary duty.[14]   Fraud committed by a fiduciary offends a public sense of justice and propriety.

The last factor weighs against a significant exemplary damages award.   Rhee's bankruptcy schedules indicate a negative net worth even excluding the amount owed to the Wus. (Case No. 11-35901, ECF No. 1).

The Court awards the Wus $5,000.00 in exemplary damages.

### iv.  Attorney's Fees

"Any person who violates the provisions of this section shall be liable to the person defrauded for reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions, and costs of court."  TEX. BUS. & COMMERCE CODE § 27.01(d).

The Wus incurred $25,235.92 in reasonable and necessary attorney's fees.

The invoices from the Wus' counsel were admitted at trial.  (Pl. Ex. 9).  Counsel for the Wus testified regarding the invoices and why the fees were reasonable and necessary to the proper completion of this case.  The testimony was credible and uncontroverted.

The sum of the individual invoices is $27,645.92.  (Pl Ex. 9).  In the beginning of the case, however, there were defendants other than Rhee.  The Wus and Rhee stipulated after trial that $2,410.00 "is a reasonable amount to be deducted from the total amount of reasonable and necessary attorneys' fees because such amount is for services allocated solely to Defendants other than Joon Rhee."  (ECF No. 32 at 1).  Subtracting $2,410.00 from $27,645.92 brings the final total to $25,235.92.

### B.  Fraudulent Inducement

---

[14]   The fiduciary relationship existed because Rhee was the Wus' real estate broker.  As set forth in more detail below, Rhee admits that this relationship creates a fiduciary relationship.

Fraudulent inducement claims are analyzed differently from typical common law fraud claims.  A successful claim for fraudulent inducement also does not depend on whether the email qualifies as a signed writing.

This case presents similar facts as *Formosa Plastics Corp. v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41 (Tex. 1998).  Presidio (a contractor) received an "invitation to bid" on a project run by Formosa.  *Formosa Plastics*, 960 S.W.2d at 43.   In the package accompanying the invitation to bid, Formosa represented that it would take care of certain aspects of the job such as arranging the delivery of materials.  *Formosa Plastics*, 960 S.W.2d at 43.  Presidio relied on these representations in making its bid.  *Formosa Plastics*, 960 S.W.2d at 43.  Formosa's statements were misrepresentations, part of an intentional scheme to defraud contractors.   These misrepresentations caused Presidio to drastically underbid.   *Formosa Plastics*, 960 S.W.2d at 44.

The Texas Supreme Court held that when a party fraudulently procures a contract by making a promise without intending to honor the promise, a cause of action for fraudulent inducement exists.   "Allowing the recovery of fraud damages sounding in tort only when a plaintiff suffers an injury that is distinct from the economic losses recoverable under a breach of contract claim . . . ignores the fact that an independent legal duty, separate from the existence of the contract itself, precludes the use of fraud to induce a binding agreement."  *Formosa Plastics*, 960 S.W.2d at 47.

Fraudulent inducement is a subset of common law fraud.  As explained by the Texas Supreme Court, "[f]raudulent inducement . . . is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof."  *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001).

The Wus' situation is similar to Presidio in *Formosa Plastics*.  The Texas Supreme Court, in the later *Haase* case, described *Formosa Plastics* as "involv[ing] a fraudulent inducement claim based on representations contained in the bid packet upon which Presidio based its contract offer, which resulted in a written contract between the two parties."   62 S.W.3d at 799.  Similarly, the Wus were induced to enter into an enforceable contract, relying on the other party's representations which were not included in the final written agreement.

Presidio was entitled to benefit-of-the-bargain damages: its profit margin plus actual costs of the work, minus what Formosa had already paid.  *Formosa Plastics*, 960 S.W.2d at 50.  Essentially, Presidio was entitled to the benefits of the contract it expected to reap had Formosa performed as it represented it would perform.

The Wus' benefit-of-the-bargain damages are equivalent to the $20,000.00 commission rebate.  Taking into account Rhee's representations, the Wus were to pay $1.98 million in total for the home ($2.0 million minus the $20,000.00 commission rebate).  The Wus instead paid a total outlay of $2.0 million.

The Wus' actual damages under a fraudulent inducement cause of action are $20,000.00.  The Court would also award[15] the Wus $5,000.00 in exemplary damages for the reasons stated above.[16]

### C.  Texas Deceptive Trade Practices Act ("DTPA")

A successful DTPA cause of action does not hinge on whether the email constitutes a signed writing.

---

[15] The Court will use the conditional for the remainder of this Memorandum Opinion because the Wus are only entitled to one recovery for this particular injury.  *See infra* PART V.

[16] The Wus would not be automatically entitled to recover their attorney's fees in a suit for fraudulent inducement.  TEX. CIV. P. & REM. § 38.001.  The Wus are entitled to exemplary damages because they have shown by clear and convincing evidence that the harm inflicted upon them resulted from Rhee's fraud.   TEX. CIV. PRACTICE & REMEDIES CODE § 41.003(a)-(b).

Real estate brokers are covered by the DTPA. *See Morgan v. Ebby Halliday Real Estate*, 873 S.W.2d 385 (Tex. App.—Fort Worth 1993). In addition, even if real estate brokers are contemplated under the exemptions section,[17] the exemption does not apply to "an express misrepresentation of a material fact that cannot be characterized as advice, judgment, or opinion." TEX. BUS. & COMMERCE CODE § 17.49(c)(1). Rhee's express misrepresentation to the Wus (that he would separately rebate them $20,000.00) may not be characterized as advice, judgment, or opinion.

The Wus' DTPA claim is based on oral misrepresentations,[18] not breach of contract. Oral misrepresentations may form the basis of a cause of action under the DTPA. *Weitzel v. Barnes*, 691 S.W.2d 598, 600 (Tex. 1985) (noting that oral misrepresentations, in addition to being admissible evidence, may serve as the basis for a DTPA action).

The Wus allege that Rhee's actions constitute "false, misleading, and deceptive acts or practices." (ECF No. 10 at 11). Under the DTPA, "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful . . . ." TEX. BUS. & COMMERCE CODE § 17.46(a).

The Wus seek recovery under § 17.50 of the DTPA. (ECF No. 10 at 12) (requesting, under the § 17.50(a)(1) damages rubric, exemplary damages and attorney's fees in addition to actual damages). Recovery under § 17.50(a)(1) is limited to the deceptive acts or practices which are specifically enumerated in § 17.46(b), also known as the "laundry-list." TEX. BUS. & COMMERCE CODE § 17.46(d).

---

[17] "Nothing in this subchapter shall apply to a claim for damages based on the rendering of a professional service, the essence of which is the providing of advice, judgment, or similar professional skill." TEX. BUS. & COMMERCE CODE § 17.49(c).

[18] Of course, if the email were determined to be a signed writing then the misrepresentations would not simply be oral.

Rhee's actions violate § 17.46(b)(5) of the DTPA. This subsection prohibits "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not." TEX. BUS. & COMMERCE CODE § 17.46(b)(5).

Section 17.46(b)(5) should be interpreted broadly:

> The terms used in § 17.46(b)(5) and (7) such as "characteristics" or "qualities" are not defined in the DTPA. Therefore, they must be given their ordinary meanings. The general objective of subdivisions (5) and (7) is to ensure that descriptions of goods and services offered for sale are accurate. Misrepresentations, so long as they are of a material fact and not merely "puffing" or opinion, are nevertheless actionable even though they are broad descriptions such as were made to Pennington. The DTPA prohibits false general descriptions about the good [or service], as well as misrepresentations pertaining to more specific information.

*Pennington v. Singleton*, 606 S.W.2d 682 (Tex. 1980).

Subsection 17.46(b)(5) encompasses Rhee's misrepresentation. Rhee falsely represented to the Wus that, if they used him as a broker to consummate the purchase of the home, Rhee would rebate $20,000.00 to the Wus. Rhee materially misrepresented the characteristics of the broker services he would provide the Wus. Rhee violated § 17.46(b)(5).

A prevailing plaintiff in a § 17.50(a)(1) action must be awarded court costs and reasonable and necessary attorneys' fees. TEX. BUS. & COMMERCE CODE § 17.50(d). As explained above, the Wus' reasonable and necessary attorneys' fees total $25,235.92.

Prevailing consumers may also obtain the amount of economic damages. TEX. BUS. & COMMERCE CODE § 17.50(b)(1). The Wus' economic damages are $20,000.00 and would be awarded by the Court.

As explained above, the Court would also award the Wus $5,000.00 in exemplary damages.

## II.    A  Signed Writing

The Texas Occupations Code states:

> A person may not maintain an action in this state to recover a commission for the sale or purchase of real estate unless the promise or agreement on which the action is based, or memorandum, is in writing and signed by the party against whom the action is brought or by a person authorized by that party to sign a document.

TEX. OCC. CODE § 1101.806.  There is authority indicating that this statute applies to everyone, not just real estate brokers.  *See Am. Garment Prop. v. CB Richard Ellis*, 155 S.W.3d 431, 436 (Tex. App.—El Paso 2004) (rejecting a narrow interpretation of § 1101.806 which would "impose[] a requirement upon the broker . . . but impose[] no such requirement upon the public from whom the broker is attempting to recover").  If applicable, this statute would prohibit a suit to recover the $20,000.00 in the absence of a writing signed by Rhee.

The Texas Uniform Electronic Transactions Act (Texas Business and Commerce Code, §§ 322.001 *et seq.*; hereinafter "TUETA") allows, in certain situations, for electronic records[19] and electronic signatures[20] to satisfy a signed writing requirement.  TEX. BUS. & COMMERCE CODE § 322.007(c) ("If a law requires a signature, an electronic signature satisfies the law.").

For TUETA to apply the parties must have agreed to conduct transactions by electronic means.  TEX. BUS. & COMMERCE CODE § 322.005(b).  An agreement need not be explicit.

---

[19] "'Electronic record' means a record created, generated, sent, communicated, received, or stored by electronic means."  TEX. BUS. & COMMERCE CODE § 322.002(7).

[20] "'Electronic signature' means an electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record."  TEX. BUS. & COMMERCE CODE § 322.002(8).

Whether the parties so agreed is "determined from the context and surrounding circumstances, including the parties' conduct." TEX. BUS. & COMMERCE CODE § 322.005(b).

The Wus introduced no evidence that the parties had an agreement (either explicit or due to prior conduct) to conduct transactions by electronic means.

There is an additional problem. For an electronic signature to be valid, it must be "executed or adopted by a person with the *intent to sign the record*." TEX. BUS. & COMMERCE CODE § 322.002(8) (emphasis added).  The purpose of this requirement is not to ensure the email's authenticity, but that the email's sender intended to sign the email.  Therefore, Rhee's admission that he wrote the email is not sufficient.  *See Cunningham v. Zurich American Ins. Co.*, 352 S.W.3d 419 (Tex. App.—Fort Worth 2011) (noting that the email at issue, although unquestionably sent by defendant, did not contain "/s/" or any other mark that unequivocally indicates a signature) ("There is nothing to show that the signature block was typed by Grabouski and not generated automatically by her email client.  If Grabouski did personally type the signature block at the bottom of the email, nothing in the email suggests that she did so with the intention that the block be her signature . . . .").

The email in *Cunningham*, even though it was eventually found to be insufficient, contained a signature block.  Rhee's email does not contain a signature block.  (Pl. Ex. 1). Furthermore, in contrast to the other emails admitted into evidence, Rhee did not write "Joon H Rhee" at the bottom of the email.  (Pl Ex. 1, 2). There is nothing to indicate that Rhee (although he authored the email) intended to sign the email.

The Court need not decide today whether this email constitutes a signed writing.  A signed writing is not necessary for the Wus to prevail on their fraudulent inducement, fraud in a

real estate transaction, and DTPA causes of action.  Furthermore, this Court believes the Texas

Supreme Court would allow promissory estoppel as an exception under these circumstances.[21]

### III.    Promissory Estoppel

The signed writing requirement of § 1101.806 of the Texas Occupations Code means that

commission contracts related to the sale of real estate fall within the Statute of Frauds.  *Givens v.*

*Dougherty*, 671 S.W.2d 877, 878 (Tex. 1984) (interpreting § 20(b) of the Texas Real Estate

License Act, which is the similarly-worded statutory predecessor to § 1101.806).

Texas law generally recognizes promissory estoppel as an exception to the Statute of

Frauds.  *Trammel Crow Co. No. 60 v. Harkinson*, 944 S.W.2d 631 (Tex. 1997). "It may apply

when there is a promise that the promisor should reasonably expect to induce action or

forbearance of a definite and substantial character on the part of the promisee, and does induce

such action or forbearance, if injustice can be avoided only by enforcement of the promise."

*Trammel Crow*, 944 S.W.2d at 636 (citing *"Moore" Burger, Inc. v. Phillips Petroleum Co.*, 492

S.W.2d 934, 937-38 (Tex. 1971)).

However, normally recognized exceptions to Texas's codified Statute of Frauds

provision[22] do not automatically apply to other state statutes within the Statute of Frauds, such as

§ 1101.806.  *Trammel Crow*, 944 S.W.2d at 636 ("We have consistently refused to erode § 20(b)

[the predecessor to § 1101.806] with the same exceptions as may render oral contracts within the

general statute of frauds enforceable.").  The Texas Supreme Court has explicitly "decline[d] to

---

[21] As there is no Texas Supreme Court case directly on point, this Court must rule as it believes the Texas Supreme Court would if this case were directly before it. *Dawkins v. White Products Corp.*, 443 F.2d 589 (5th Cir. 1971) ("It is, of course, much preferable for the federal court to apply state law as precisely articulated by a state court of highest jurisdiction.  However, if not state court decision precisely on point is available to guide the federal court, we are compelled to decide to the best of our ability what the state court *would* hold if this case were *now* before it.") (emphasis in original).

[22] The Texas Statute of Frauds provision is § 26.01 of the Texas Business and Commerce Code.

hold the doctrine of promissory estoppel is an exception to § 20(b) of RELA." *Trammel Crow*, 944 S.W.2d at 636.

The context of the lawsuit in *Trammel Crow* was especially important to the holding. Promissory estoppel applies where the promisor should reasonably expect a promise to induce action or forbearance by the other side, and where injustice may be avoided only by enforcement of the promise. This was not the case in *Trammel Crow*, where the lawsuit was brought by a licensed real estate broker, a person necessarily familiar with Texas real estate law:

> As a licensed real estate broker, Harkinson cannot act or forbear from acting in reliance on anything less than a signed written commission agreement. When a broker does so and relies on a promise to sign a written agreement that would satisfy section 20(b), the broker inevitably does so at his or her own peril.

*Trammel Crow*, 944 S.W.2d at 636-37. In other words, Harkinson (the licensed real estate broker) chose to rely on an oral agreement that he knew or should have known would not be enforceable. It was not necessary to enforce the promise in order to avoid injustice. The real estate broker knowingly accepted the risk that the other side would not perform.

This situation is materially distinguishable. The Wus are not licensed real estate brokers and therefore not necessarily familiar with the requirements on commission agreements imposed by Texas real estate law. In addition, and perhaps more importantly, Rhee owed fiduciary duties to the Wus.[23] Unlike Harkinson in *Trammel Crow*, the Wus reasonably believed they could rely an oral promise from Rhee (their broker who owed them a fiduciary duty of loyalty). Injustice may only be avoided here by enforcing Rhee's promise.

---

[23] Rhee acknowledged that he owed the Wus such a duty, both in his pleadings and in his trial testimony. (ECF No. 25 at 2). Even if he had not, Texas law clearly imposes fiduciary duties on real estate agents and brokers. 22 TEX. ADMIN. CODE § 531.1 (2012) ("A real estate broker or salesperson, while acting as agent for another, is a fiduciary.").

Given the reasoning behind the ruling in *Trammel Crow*, the Court believes that the Texas Supreme Court would allow promissory estoppel as an exception to the Statute of Frauds when a client sues a real estate broker who owes them a fiduciary duty to enforce a promise made by the broker.

### IV.    Additional Causes of Action

With promissory estoppel as a valid exception to the signed writing requirement of §1101.806, the Wus have additional viable causes of action.

#### A.  Breach of Contract

"The elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach." *Wright v. Christian & Smith*, 950 S.W.2d 411 (Tex. App.—Houston 1997).

The elements are easily met after establishing the existence of a valid contract. The Wus performed. Rhee did not. The Wus suffered $20,000.00 in damages as a result of Rhee's failure to perform.

The Wus are entitled under Texas law to recover their attorney's fees for a successful breach of contract claim. Tex. Civ. Practice & Remedies Code § 38.001(8). As discussed above, the Wus have incurred $25,235.92 in reasonable and necessary attorney's fees. This is in addition to the amount of their claim ($20,000.00) plus costs. Tex. Civ. Practice & Remedies Code § 38.001.

The Wus are entitled to exemplary damages because they have shown by clear and convincing evidence that the harm inflicted upon them resulted from Rhee's fraud. Tex. Civ.

PRACTICE & REMEDIES CODE § 41.003(a)(1).  For the reasons explained above, the Court would award $5,000.00 in exemplary damages.

### B.  Conversion

Under the heading "embezzlement" in their complaint, the Wus allege that "Rhee misappropriated the entire commission for his own benefit, to the exclusion of Mr. and Mrs. Wu, and he did so with fraudulent intent."  (ECF No. 10 at 9).  Under the heading "Failure to Properly Account for Funds Held in Trust and Request for Constructive Trust," the Wus state:

> Rhee holds money for Mr. and Mrs. Wu in a fiduciary capacity.  Rhee was required to properly account for and remit the money to Mr. and Mrs. Wu within thirty days after their demand.  At least two written demands were made to Rhee for payment.  Rhee ignored these demands and did not remit the funds to Mr. and Mrs. Wu.

(ECF No. 10 at 10).  These statements are akin to an allegation of conversion.[24]

In Texas, "[t]o establish a claim for conversion, a plaintiff must prove: (1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property."  *Miller v. Carter*, 2012 Tex. App. LEXIS 7255 at *10 (citing *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 366 (Tex. App.—Dallas 2009, pet. denied)).

Given the Court's findings of fact and rulings of law discussed above, the Wus were entitled to $20,000.00 of the commission.  Rhee exercised control over the property in a manner

---

[24] It is the substance of the relief sought upon which courts must focus, not the particular label used.  *See Armstrong v. Capshaw, Goss & Bowers*, 404 F.3d 933 (5th Cir. 2005) (noting district courts must determine the true nature of a pleading by its substance, rather than its labels) (citing *Edwards v. City of Houston*, 78 F.3d 983, 995 (5th Cir. 1996) (*en banc*) ("[W]e have oft stated that 'the relief sought, that to be granted, or within the power of the Court to grant, should be determined by substance, not a label'") (quoting *Bros. Inc. v. W.E. Grace Mfg. Co*., 320 F.2d 594, 606 (5th Cir. 1963)).

inconsistent with the Wus' rights in the property.  As a fiduciary, Rhee held the Wu's $20,000.00 in trust for them.  The Wus demanded Rhee give them the $20,000.00.  Rhee refused. Rhee spent the corpus of the trust.

Again, the Wus are entitled to exemplary damages because they have shown by clear and convincing evidence that the harm inflicted upon them resulted from Rhee's fraud.  Tex. Civ. Practice & Remedies Code § 41.003(a)(1).  This Court would award $5,000.00 in exemplary damages.[25]

### C.  Common Law Fraud

As discussed above, common law fraud is analyzed differently from fraudulent inducement under Texas law.

Without establishing their contractual right to a portion of the commission, the Wus would not be able to pursue a tort cause of action for common law fraud to recover the $20,000.00.  *See Trammell Crow Co. No. 60 v. Harkinson*, 944 S.W.2d 631 (Tex. 1997) (refusing to allow a broker's tort claims for tortious interference and civil conspiracy where broker sought damages equal to the commission broker could not collect in a breach of contract action).  As the Wus have established their contractual right to the $20,000.00, this is not an issue.

To prevail on their common law fraud claim, the Wus must prove:  "(1) [Rhee] made a material representation that was false; (2) [Rhee] knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) [Rhee] intended to induce [the Wus] to act upon the representation; and (4) [the Wus] actually and justifiably relied upon the representation and thereby suffered injury."  *Ernst & Young, L.L.P. v. Pac. Mut. Life*

---

[25] The Wus would not be automatically entitled to recover their attorney's fees in a suit for conversion.  Tex. Civ. Practice & Remedies Code § 38.001.

*Ins. Co.*, 51 S.W.3d 573 (Tex. 2001) (citing *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983)).

Rhee's promise to rebate $20,000.00 of his commission to the Wus was both material and false when made.  Rhee knew the representation was false.  Rhee made the promise with the intent to induce the Wus to consummate the purchase of the home.  The Wus actually and justifiably relied on Rhee's promise.  The Wus suffered injury in the amount of $20,000.00 as a result.

Again, the Wus are entitled to exemplary damages because they have shown by clear and convincing evidence that the harm inflicted upon them resulted from Rhee's fraud.  TEX. CIV. PRACTICE & REMEDIES CODE. § 41.003(a)(1).  For the reasons stated above, this Court would award $5,000.00 in exemplary damages.[26]

### V.    Multiple Recoveries Prohibited

Under Texas law, the amount of a plaintiff's recovery is limited by the "one-satisfaction rule."  This rule dictates that "a plaintiff is entitled to only one recovery for any damages suffered because of a particular injury."  *Utts v. Short*, 81 S.W.3d 822 (Tex. 2002) (citing *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000)).

"When a party tries a case on alternative theories of recovery and a jury returns favorable findings on two or more theories, the party has a right to a judgment on the theory entitling him to the greatest or most favorable relief."  *Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988).

---

[26] The Wus would not be automatically entitled to recover their attorney's fees in a suit for common law fraud.  TEX. CIV. P. & REM. § 38.001.

The Wus successfully proved multiple causes of action.  The causes of action for fraud in a real estate transaction, the DTPA violations, and breach of contract result in the largest recovery for the Wus ($50,235.92 plus costs and interest).

## VI.   Exception from Discharge under Subsection 523(a)(2)(A)

### A.  Elements

In order "[f]or a debt to be nondischargeable under section 523(a)(2)(A), the creditor must show (1) that the debtor made a representation; (2) that the debtor knew the representation was false; (3) that the representation was made with the intent to deceive the creditor; (4) that the creditor actually and justifiably relied on the representation; and, (5) that the creditor sustained a loss as a proximate result."  *In re Mercer*, 246 F.3d 391, 403 (5th Cir. 2001).  These elements generally correspond with those necessary to prove fraud in a real estate transaction.

Rhee represented that he would rebate $20,000.00 (one-third of the total $60,000.00 commission) to the Wus if they went forward with the purchase.

As set forth above, the Wus accepted Rhee's offer.  It is undisputed that Rhee did not pay the Wus $20,000.00.  It is also undisputed that, after the closing, Rhee avoided the Wus' phone calls and emails.  The only reasonable conclusion from these facts is that Rhee knew the representation was false (that is, Rhee knew he would not rebate the funds) and that Rhee made the representation with the intent to deceive the Wus.

The Wus actually relied on Rhee's representation.  Subsection 523(a)(2)(A) requires only that the Wus' reliance be justifiable, which is a lesser standard than reasonable reliance.  *Field v. Mans*, 516 U.S. 59 (1995).  The Wus meet either standard.  Although a dispute arose, Rhee and the Wus exchanged relatively amicable emails in an attempt to settle the commission issue and move forward with the purchase of the home.  More importantly, Rhee had a fiduciary duty of

loyalty to the Wus as their broker.  It was both reasonable and justifiable for the Wus to rely on Rhee's settlement offer.

The Wus sustained a loss as a proximate result of Rhee's misrepresentation.

The Wus meet all elements of § 523(a)(2)(A).

### B.  Extent of Debt Excepted From Discharge

Subsection 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud . . ."  11 U.S.C. § 523(a)(2)(A).

The United States Supreme Court held "that § 523(a)(2)(A) prevents the discharge of all liability *arising from fraud*." *Cohen v. De La Cruz*, 118 S.Ct. 1212, 1215 (1998) (emphasis added).  The debt excepted from discharge is not merely the value of the goods or services fraudulently obtained.  Instead, "any liability arising from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor" is excepted from discharge.  *Cohen v. De La Cruz*, 118 S.Ct. at 1219.

Applied to our situation, the debt excepted from discharge is not merely $20,000.00 (the portion of the commission Rhee promised to pay the Wus but kept for himself).  The debt excepted from discharge includes exemplary damages and attorney's fees, as these debts also arise from Rhee's fraud.

The total amount excepted from discharge under § 523(a)(2)(A) is $50,235.92 plus costs and interest.  This is the sum of actual damages ($20,000.00), exemplary damages ($5,000.00), statutorily mandated attorney's fees ($25,235.92), plus costs and interest.

**VII.    If the Court Accepted Rhee's Version of the Facts**

As acknowledged by his pleadings and trial testimony, Rhee owed the Wus a fiduciary duty.  22 TEX. ADMIN. CODE § 531.1 (2012) ("A real estate broker or salesperson, while acting as agent for another, is a fiduciary.").  Even under his version of the facts, Rhee violated his fiduciary duty to the Wus.

When pressed as to how the discussions surrounding the commission issue evolved, Rhee stated:

> I mean I don't know what they were thinking in their mind but after that kind of discussion of whether they felt like they should get the commission that I earned or I should get my full commission . . . you know, we just kind of had this disagreement and it was just kind of left open.  And honestly I was kind of trying to avoid that issue because I didn't want to bring it up again because I didn't want to argue with them and . . .  It's a situation where they don't feel comfortable arguing, I don't feel comfortable arguing, so we kind of just left it on the back burner. And then once the closing date approached a lot of things started to occur like Walter called me literally maybe two or three days before the closing because some of the things that they wanted, which were not traditional things that you would request on a home purchase, . . . umm . . . Walter couldn't find. So there were a lot of kind of last minute deals that came up, plus with bankruptcy court[27] there were so many details that they wanted done that I had to bother them about that we were just really too busy to sit down again and have that conversation in detail.

(Trial Recording 11:18:33 am – 11:19:40).

When asked whether the commission issue was ever brought up again after the Wus allegedly turned down his offer, Rhee stated:

> I mean I don't know if it wasn't ever brought up. I mean, it was kind of like we need to get this issue resolved and, like I said, [Roger Wu and I] had a pretty good relationship until this point.  I've purchased many cars from him and, like he said, I mean literally, like . . .  I would get the key and just drive off because we had an understanding you know . . . .  I guess that was kinda the way he felt like everything was going to happen.

---

[27] The 1305 South Boulevard property was actually purchased, with court approval, from an unrelated bankruptcy estate.

Just because he felt like he would get that money, and he deserved that money, that I would give it to him. But, honestly you know I didn't think that that was right and there was no agreement to do so. So, you know, things just kind of happened the way it is. It's unfortunate.

(Trial Recording 11:20:02 am – 11:20:49).

The following exchange occurred after Rhee was questioned as to how the sale went

forward although the commission issue remained unsettled:

**Court:** I want to know the next conversation . . . Something happened after the conversation on June 16th, and before the earnest money contract gets signed on June 19th. They had to have a discussion with you. What is that discussion?

**Rhee**: That day she called me . . . we were talking about, she was talking about her points why she felt they should get the commission, I gave my points of why I felt that I should keep and [had] earned my commission and we ended it to where we kind of just . . . let's agree to disagree, we'll try to get it resolved later. The deadline I guess from the bankruptcy court to get this contract submitted was literally that next day or two, which I believe was a Friday. So, I guess my next conversation with them was "we have to get this contract submitted or else you're gonna lose the property."

[ . . . ]

**Court:** So, you thought when the contract was signed, that y'all had not yet worked out what to do about the $60,000.00?"

**Rhee:** In my mind, I felt like there was no agreement for me to give any of my commission to anybody . . . So . . .

**Court**: But you thought you did not have an agreement with them one way or the other. They hadn't agreed to pay it and you hadn't agreed to rebate it.

**Rhee:** Well but the commission comes from the seller . . . But yeah, yes sir. Yes.

(Trial Testimony 11:34:20 am –11:36:28 am).

These excerpts from the trial testimony combined with the facts acknowledged by both sides establish the following:  (i) Rhee knew the Wus believed they were owed some portion of his commission; (ii) Rhee knew that he had not resolved the commission issue with the Wus (his fiduciaries) prior to the closing; and, (iii) Rhee refused to respond to the Wus calls or emails after the closing.

Rhee's conduct constitutes a violation of his fiduciary duty to the Wus.  A fiduciary duty imposes special obligations on a real estate agent.  The real estate agent must "be faithful and observant to trust placed in the agent, and be scrupulous and meticulous in performing the agent's functions."  22 TEX. ADMIN. CODE § 531.1(2).  Additionally, "the real estate agent [must] place no personal interest above that of the agent's client."  22 TEX. ADMIN. CODE § 531.1(3).  Rhee violated both of these aspects of his fiduciary duty to the Wus.

The amount of debt, if any, Rhee would owe the Wus under Rhee's version of the facts is unclear.  Any such debt would be excepted from discharge § 523(a)(4).

## Conclusion

The Court will issue a separate Judgment consistent with this Memorandum Opinion.

SIGNED **October 19, 2012.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE